UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GREAT LAKES CHEESE OF NEW YORK, INC.,

                           Plaintiff,                  7:14-CV-0232
                                                     (GTS/ATB)

v.


AGRI-MARK, INC.,

                           Defendant.
_____

AGRI-MARK, INC.,

                           Third-Party Plaintiff,

v.


BERNARD THOMAS & PENNY THOMAS d/b/a
M&T TRANSP.,

                           Third-Party Defendants.
_____

APPEARANCES:                             OF COUNSEL:

HAHN LOESER & PARKS LLP           CRAIG O. WHITE, ESQ.
  Counsel for Plaintiff                 DENNIS ROSE, ESQ.
200 Public Square, Suite 2800         OLIVER J. DUNFORD, ESQ.
Cleveland, OH 44114

GILBERTI STINZIANO HEINTZ &      DEAN J. DiPILATO, ESQ.
SMITH, P.C.
  Counsel for Plaintiff
555 East Genesee Street
Syracuse, NY 13202

SANTACROSE & FRARY                          SEAN A. TOMKO, ESQ.
   Counsel for Defendant/Third-Party
   Plaintiff
Columbia Circle Office Park
1 Columbia Circle
Albany, NY 12203

WILSON ELSER MOSKOWITZ                      CHRISTOPHER J. MARTIN, ESQ.
EDELMAN & DICKER, LLP
   Counsel for Third-Party Defendants
677 Broadway
Albany, NY 12207

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this breach of contract action arising under diversity

jurisdiction and filed by Great Lakes Cheese of New York, Inc. ("Plaintiff" or "Great Lakes")

against Agri-Mark, Inc. ("Defendant," "Third-Party Plaintiff," or "Agri-Mark"), is a motion for

summary judgment, filed by Bernard Thomas and Penny Thomas, d/b/a M&T Transport ("Third-

Party Defendant" or "M&T") against Third-Party Plaintiff (Dkt. No. 61), and a cross-motion for

summary judgment, filed by Third-Party Plaintiff against Third-Party Defendant (Dkt. No. 67).

For the reasons set forth below, Third-Party Defendant's motion is denied, and Third-Party

Plaintiff's cross-motion is denied.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, in its Complaint, Great Lakes alleges as follows.   Great Lakes, a cheese

manufacturer, entered into a contract with Agri-Mark, a dairy cooperative located in

Massachusetts, pursuant to which Agri-Mark agreed to sell raw milk to Great Lakes.  (Dkt. No. 1

at ¶ 2-3, 6 [Plf.'s Compl.].)  On or about August 14, 2013, Great Lakes received a shipment of

raw milk from Agri-Mark, delivered to Great Lakes' plant in Adams, New York, by M&T, Agri-Mark's agent. (*Id.* at ¶ 7.) The shipment–which totaled approximately 40,498 pounds of Agri-Mark's milk–was pumped from M&T's trailer ("Trailer 8042") and into a silo. (*Id.* at ¶ 8.)

Thereafter, a Great Lakes operator disconnected the lines through which the milk was pumped into the silo and observed what he believed to be "sediment." (*Id.* at ¶ 9.) The operator then checked the receiving-line filters on the discharge side of the receiving pump at the bay where Trailer 8042 had unloaded Agri-Mark's raw milk. (*Id.*) The operator discovered "contaminants including metal filings, buffing-wheel material, steel, and stainless-steel cutting-wheel material" (referred to generally in Plaintiff's Complaint as "Metal Contaminant"). (*Id.*)

By that time, the contaminated raw milk "was in the process of being transferred" from the silo to which it had been pumped to the "high-temperature short-time" ("HTST") unit for pasteurization. (*Id.* at ¶ 10.) At the end of the day, Great Lakes personnel inspected the filters of the silos from which milk had been pumped to the HTST unit and again discovered Metal Contaminant. (*Id.* at ¶ 12.) Further inspection revealed Metal Contaminant in the filters of Great Lakes' cleaning system that services "truck washings" at the same bay where M&T had unloaded the contaminated raw milk, as well as in the filters of the plant's "ultra-filtration unit" and "post-milk HTST unit." (*Id.* at ¶¶ 13-14.)

On August 15, 2013, Great Lakes discovered that milk pumped from a different silo was also contaminated because a line that had been used to pump Agri-Mark's milk had subsequently been used to pump milk from other suppliers (before any signs of contamination had been discovered). (*Id.* at ¶ 19.) Ultimately, Agri-Mark had to take numerous steps to remedy the contamination, including (1) "another round of filter inspections," (2) shutting down the entire

plant on August 16, 2013, when more "[m]etal debris" was discovered in the HTST unit's filters, (3) several "water flushes" of the HTST unit, and (4) a complete cleaning of the HTST unit by hand. (*Id.* at ¶¶ 20-22.) As a result, Agri-Mark lost "almost a full day of production" and approximately 362,519 pounds of cheese were exposed to Metal Contaminant, rendering the cheese unfit for human consumption. (*Id.* at ¶ 22-23.)

Based upon these factual allegations, Great Lakes' Complaint asserts the following four claims against Agri-Mark: (1) a claim for breach of contract; (2) a claim for breach of express warranty; (3) a claim for breach of the implied warranty of merchantability; and (4) a claim for breach of warranty of fitness for a particular purpose. (Dkt. No. 1 at ¶¶ at 24-46.)

## B. Agri-Mark's Third-Party Complaint

Generally, in its Third-Party Complaint, Agri-Mark alleges as follows. (Dkt. No. 14 [Third-Party Compl.].) Prior to August 14, 2013 (i.e., the date on which M&T delivered allegedly contaminated raw milk to Great Lakes), Agri-Mark entered into a contract with M&T, pursuant to which M&T agreed provide "trucking services" on behalf of Agri-Mark "regarding the hauling of milk." (*Id.* at ¶ 10.) On August 14, 2013, M&T "hauled a load of milk on behalf of Agri-Mark . . . in a trailer [M&T] owned to" Great Lakes' facility. (*Id.* at ¶ 12.) Before the milk was placed in M&T's truck, it was "free from contamination." (*Id.* at ¶ 13.) As a result, if the milk contained contaminants, it was contaminated in M&T's trailer and/or while it was in M&T's custody and/or control. (*Id.* at ¶ 15.)

Based upon these factual allegations, Agri-Mark asserts two claims against M&T: (1) a claim for negligence, pursuant to which Agri-Mark seeks contribution and/or common law indemnification; and (2) a claim for breach of contract, pursuant to which Agri-Mark seeks

damages and/or contractual indemnification.[1] (*Id.* at ¶¶ 9-19, 43-51.)

## C. Undisputed Material Facts

### 1. Statement on M&T's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported by M&T in its statement of material facts and either expressly admitted or denied without an accurate record citation by Agri-Mark in its response thereto. (Dkt. No. 61, Attach. 3 [Third-Party Def.'s Rule 7.1 Statement] *with* Dkt. No. 67, Attach. 11, at ¶¶ 1-11 [Third-Party Plf.'s Rule 7.1 Response].)

1.    Great Lakes is a large producer of Grade A cheese with a manufacturing plant located in Adams, New York (the "Plant").

2.    Agri-Mark is a large supplier of milk to various entities across New England and New York State.

3.    Agri-Mark also owns and operates three cheese plants and a butter powder plant.

4.    Agri-Mark would hire various milk haulers, including M&T, to provide milk to various producers including the Great Lakes plant. M&T is a hauler of milk and milk products for various milk suppliers.

5.    Pursuant to a purchase agreement with Great Lakes, Agri-Mark ordered approximately 40,498 pounds of Agri-Mark's raw milk, to be delivered on August 14, 2013.

6.    This raw milk was hauled and delivered to Great Lakes by M&T at the request of Agri-Mark.

---

[1]    Agri-Mark also asserted claims of negligence against Bluegrass Tank and Equipment Co., Inc. ("Bluegrass"), and Queensboro Farm Products, Inc. ("Queensboro") (Dkt. No. 14 at ¶¶ 20-42), but Agri-Mark later stipulated to voluntary dismissal of its claims against these parties (Dkt. Nos. 52-53, 64-65).

7.      After the shipment was unloaded, metal contaminant was found in Great Lakes' Plant.

8.      Great Lakes claimed resulting economic damages as follows: (1) 362,518.66 pounds of lost cheese product, (2) 245,000 pounds of contaminated raw milk, (3) discarded cheese starter culture, (4) cleaning and sanitation costs, (5) lost production time at the Plant, (6) fees for milk diversion, and (7) storage and handling costs.

9.      There was no written contract between Agri-Mark and M&T.

10.     Agri-Mark does not have written contracts with any of its haulers. (Dkt. No. 67, Attach. 24, at 50, 56 [Gilchrist EBT]; Dkt. No. 67, Attach. 25, at 1415 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 2, at ¶ 5 [Gilchrist Aff.].)

11.     Agri-Mark has only oral agreements with its haulers. (Dkt. No. 67, Attach. 24, at 50, 56 [Gilchrist EBT]; Dkt. No. 67, Attach. 25, at 14-15, 23-24 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 2, at ¶ 5 [Gilchrist Aff.].)

## 2.      Statement on Agri-Mark's Cross-Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported by Agri-Mark in its statement of facts and either expressly admitted or denied without an accurate record citation by M&T in its response thereto. (*Compare* Dkt. No. 67, Attach. 11, ¶¶ 12-63 [Third-Party Plf.'s Rule 7.1 Statement] *with* Dkt. No. 69, Attach. 1 [Third-Party Def.'s Rule 7.1 Response].)

1.      Third-Party Defendants Bernard Thomas & Penny Thomas d/b/a M&T Transport are individuals who are business partners and co-owners doing-business-as M&T Transport.

2.      Bluegrass is a Kentucky corporation and is a sanitary tank production and repair company.

3.      Queensboro is a New York corporation with a facility in, Canastota, New York, and is a processor of milk and cheese products.

4.      Great Lakes claims that it sustained damages as a result of metal contamination contained within a load of milk delivered to the Great Lakes plant on August 14, 2013.

5.      Great Lakes and Agri-Mark entered into a written contract, whereby Agri-Mark agreed to supply milk to Great Lakes.

6.      Agri-Mark agreed to supply and deliver the milk in accordance with applicable regulatory requirements.

7.      The production, delivery and processing of milk is highly regulated and controlled by the Food and Drug Administration ("FDA"), United States Department of Agriculture ("USDA"), and the State of New York Department of Agriculture and Markets ("NYSDAM").

8.      Prior to August 14, 2014, the Pasteurized Milk Ordinance ("PMO") revision was in effect in the State of New York and covered the delivery at issue in this litigation.[2]

---

[2]      The PMO was promulgated by the Food and Drug Administration, and is "recognized by the Public Health Agencies, the milk industry, and many others as the national standard for milk sanitation."  (Dkt. No. 67, Attach. 13, at iv [PMO, 2011 Revision, Preface].)  The only part of the PMO specifically referenced by the parties on the pending motions is Item 14r, titled "Protection from Contamination."  (*Id.* at 49.)  Item 14r provides, in part, as follows:

> Vehicles used to transport milk from the dairy farm to the milk plant, receiving station or transfer station shall be constructed and operated to protect their contents from sun, freezing and contamination.  Such vehicles shall be kept clean, inside and out, and no substance capable of contaminating the milk shall be transported with the milk.

(*Id.* at 49.)  These requirements are also embodied in NYSDAM regulations.  1 N.Y.C.R.R. § 2.27.

9.      The load of milk delivered to the Plant on August 14, 2013, which is the subject of this suit, was delivered by M&T pursuant to oral agreement between Agri-Mark and M&T.

10.      Prior to August 14, 2013, Bernard L. Thomas ("Thomas") and Robert Gilchrist ("Gilchrist") orally agreed that M&T would haul loads of milk for Agri-Mark.[3]

11.      As a hauler of milk, M&T is required by regulation to use clean vehicles that are free of substances capable of contaminating the milk.  (Dkt. No. 67, Attach. 25, at 23-25 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 2, at ¶¶ 11-13 [Gilchrist Aff.]; Dkt. No. 65, Attach. 2, at ¶¶ 15-17 [Moore Aff.]; *see also, supra,* note 2 of this Decision and Order.)

12.      As an owner of M&T, Thomas had the capacity to enter into contracts on behalf of M&T.

13.      As the Transportation Manager for Agri-Mark, Gilchrist had the capacity to enter into contracts on behalf of Agri-Mark.[4]

14.      The parties agreed that M&T would be paid for its services at a rate set forth by a hauling committee based on load sheets.

15.      On August 14, 2013, M&T orally agreed to haul (and did haul) 40,583 pounds of milk from Agri-Mark to Great Lakes' plant.

---

[3]      During his deposition, Thomas testified that there were no "written contracts" between Agri-Mark and M&T before August 2013.  (Dkt. No. 67, Attach. 25, at 14 [B.L. Thomas EBT].)  Rather, M&T and Agri-Mark had "[h]andshake" agreements.  (*Id.* at 14-15.)  Similarly, during his deposition, Gilchrist testified that Agri-Mark did not have written contracts with its haulers.  (Dkt. No. 67, Attach. 24, at 50.)  When asked if Agri-Mark's arrangements with haulers were premised on "just an oral agreement," Gilchrist answered, "Yep."  (*Id.*)

[4]      Agri-Mark's Rule 7.1 Statement appears to incorrectly assert that Gilchrist had the capacity to enter into contracts on behalf of M&T, rather than Agri-Mark, and M&T's Rule 7.1 Response (purporting to admit this factual assertion in part) replicates this apparent error.  (Dkt. No. 67, Attach. 11, at ¶ 27; Dkt. No. 69, Attach. 1, at ¶ 27.)

16.     M&T was paid by Agri-Mark for its August 14, 2013, delivery to Great Lakes.

17.     An oral agreement existed between Agri-Mark and M&T regarding the load delivered to Great Lakes on August 14, 2013.  (Dkt. No. 67, Attach. 25, at 23-25 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 2, at ¶¶ 11-13 [Gilchrist Aff.]; Dkt. No. 65, Attach. 2, at ¶¶ 15-17 [Moore Aff.]; *see also, supra,* note 2 of this Decision and Order.)

18.     M&T used Trailer 8042 to deliver the milk and off-loaded Trailer 8042 into Great Lakes bay four (4).

19.     On the same date, two other loads of milk left the same originating farms as the alleged contaminated milk and arrived at Agri-Mark.

20.     Great Lakes claims that it sustained damages as a result of metal contamination contained within a load of milk delivered to its plant on August 14, 2013.

21.     Great Lakes claims that milk off-loaded from Trailer 8042 contained metal contamination which was pumped into silo 700, contaminating the milk already stored within silo 700.  (Dkt. No. 67, Attach. 25, at 28-30 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 69 [Invoice].)

22.     Great Lakes claims that the resulting contamination spread throughout its plant.

23.     Prior to August 14, 2013, Trailer 8042 was involved in an accident in which it sustained significant damage.

24.     Pursuant to an oral agreement with M&T, Bluegrass performed repairs on Trailer 8042, which involved (among other things) "install[ing] (3) sections of barrel" and "repair[ing] stainless rings as needed."  (Dkt. No. 67, Attach. 25, at 28-30 [B.L. Thomas EBT]; Dkt. No. 67, Attach. 69 [Invoice].)

25. Bluegrass returned the trailer to M&T without performing sanitary cleaning of the trailer.

26. Once M&T received Trailer 8042 back from Bluegrass, Thomas instructed his employee, Robert Makela, to clean Trailer 8042.

27. During his deposition testimony, Makela testified that, while cleaning Trailer 8042, he observed "a considerable amount" of "red sediment" inside the trailer. (Dkt. No. 67, Attach. 30, at 23 [Makela EBT].)

28. Mr. Makela further testified that, while washing Trailer 8042, he did not remove the valves from the trailer because he "[h]ad other stuff to do." (*Id.* at 28.)

29. Under the PMO, a hauler of milk is required to obtain a sanitary wash at a NYSDAM-approved facility prior to loading milk for delivery.

30. Thomas claims that, after Robert Makela washed Trailer 8042, a sanitary wash was performed at Queensboro on August 12, 2013, prior to the subject milk being loaded into Trailer 8042.

31. Specifically, Thomas testified during his deposition that the sanitary wash was performed at Queensboro's facility, and a Queensboro "wash tag" was affixed to M&T Trailer 8042 by a Queensboro employee. (Dkt. No. 67, Attach. 25, at 44, 61 [B.L. Thomas EBT].)[5]

32. Following a sanitary wash at an a NYSDAM-approved facility, a "wash tag" is supposed to be placed upon the rear of the trailer by the facility where the wash occurred.

---

[5] A wash tag "indicates [that a] tank was washed, where it was washed[, ]the time it was washed and by who it was washed." (Dkt. No. 67, Attach. 24, at 61 [Gilchrist EBT].) Wash tags are used "[t]o show that a tank has been washed within so many hours" before milk is loaded into a trailer for the purpose of protecting against bacterial contamination. (*Id.*)

33.     Queensboro denies that it washed Trailer 8042 at any time from the date it was involved in its accident until the date of the subject milk delivery.

34.     Queensboro produced its graph logs documenting that its "clean in place" sanitary wash system was never used on Trailer 8042 on August 11, August 12, or August 13, 2013.

35.     M&T is unable to produce the wash tag that it claims was on Trailer 8042 on the day of the incident.

36.     Andrew Segouin, the milk receiver at Great Lakes during the delivery at issue, testified that he did not recall seeing a wash tag on Trailer 8042 at any point on the date of the delivery.  (Dkt. No. 67, Attach. 28, at 20 [Segouin EBT].)

37.     Bernard E. Thomas delivered the load of milk directly from the farms to Great Lakes Cheese.

38.     The load of milk delivered to Great Lakes on August 14, 2013, was the first load of milk hauled in M&T Trailer 8042 following its accident and repair.

39.     On August 14, 2013, M&T was a licensed hauler of milk within the State of New York.

40.     The PMO required that the hauler of the milk, M&T, would not contaminate the milk it hauled from the farm to the facility.  (*See, supra*, Fact. No. 11 of Part I.C.2 of this Decision and Order.)

**D.     Parties' Briefing on M&T's Motion for Summary Judgment and Agri-Mark's Cross-Motion for Summary Judgment**

**1.     M&T's Memorandum of Law**

Generally, in support of its motion for summary judgment, M&T asserts three arguments: (1) Agri-Mark has not established that an enforceable contract between it and M&T existed (Dkt. No. 61, Attach. 4, at 4-5 [Third-Party Def.'s Memo. of Law]); (2) even if there was a contract,

Agri-Mark has not demonstrated that M&T breached it because (a) M&T did not agree to warrant the condition of the raw milk it hauled on behalf of Agri-Mark and (b) Agri-Mark's breach-of-contract with Great Lakes did not require the delivery of uncontaminated milk, and Agri-Mark itself did not warrant the milk it supplied to Great Lakes (*id.* at 5-6); and (3) Agri-Mark's negligence claim is barred by the economic loss rule because Agri-Mark seeks recovery of purely pecuniary losses (*id.* at 6-8).

### 2. Agri-Mark's Memorandum of Law in Opposition to M&T's Motion and in Support of Agri-Mark's Cross-Motion

Generally, in opposition to M&T's motion for summary judgment and in support of its cross-motion for summary judgment, Agri-Mark asserts ten arguments: (1) Agri-Mark and M&T had an enforceable oral contract, pursuant to which M&T, a licensed hauler of milk, agreed to haul milk for Agri-Mark on the date at issue in this case (Dkt. No. 67, Attach. 12, at 9-12 [Third-Party Plf.'s Opp'n Memo. of Law]); (2) pursuant to industry custom, it is "inherent in all contracts to haul milk within the State of New York with licensed milk haulers" that the hauler is required comply with the PMO and NYSDAM regulations in performing its obligations (*id.* at 13, 19-20); (3) M&T has "been hauling milk" for Agri-Mark as an independent contractor, on an at-will basis, for more than twenty years, and the parties' prior dealings may be analyzed "if necessary" to "evaluat[e] the terms of a contract" (*id.* at 13); (4) the oral agreement between Agri-Mark and M&T does not fall within the New York Statute of Frauds (*see* N.Y. Gen. Oblig. Law § 5-701), and load tickets signed by M&T are proof of the existence of a contract between the parties (*id.* at 14); (5) Agri-Mark performed under the contract by paying M&T for hauling the raw milk to Great Lakes' plant on August 14, 2014 (*id.*); (6) the record evidence establishes that Trailer 8042 was the source of the contamination alleged by Great Lakes and, under federal

and state regulations, the hauler is responsible for the cleanliness of the trailer used to haul milk (*id.* at 14-15); (7) the damages that Great Lakes seeks to recover from Agri-Mark (and, by extension, the damages that Agri-Mark seeks to recover from M&T) represent the natural and probable consequence of M&T's contamination of the milk (*id.* at 15); (8) pursuant to the parties' oral contract, M&T was also obligated to procure insurance and name Agri-Mark as a certificate holder and additional insured, and this fact entitles Agri-Mark to "conditional indemnity" against M&T (*id.* at 16-18); (9) Agri-Mark is entitled to common law indemnification against M&T because (a) the "obligations contained in the PMO and NYSDAM regulations" constitute an independent duty that M&T owed to Agri-Mark and breached by negligently failing to sanitize its trailer (*id.* at 18-20); and (10) the economic loss rule does not bar Agri-Mark's negligence claim against M&T because (a) M&T owed an independent duty to Great Lakes pursuant to the PMO and state and federal regulations, and M&T breached that duty by contaminating the milk it delivered to Great Lakes, and (b) in its Complaint, Great Lakes seeks to recover for damaged property other than the contaminated Agri-Mark milk, namely, the "other unrelated milk" that the Agri-Mark milk came into contact with and contaminated (*id.* at 21-22).

### 3. M&T's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment and in Opposition to Agri-Mark's Cross-Motion for Summary Judgment

Generally, in its reply, M&T reiterates the arguments set forth in its memorandum of law in chief and, moreover, argues as follows: (1) Agri-Mark has failed to demonstrate any purported terms of any contract that it has with M&T, and the record demonstrates that Agri-Mark had no contracts with any of its milk haulers (Dkt. No. 69, Attach. 2, at 5-6 [Third-Party Def.'s Reply Memo. of Law]); (2) the record contains no evidence that M&T had an objective manifestation

of intent to be bound by any such contract (*id.* at 6-7); (3) if a contract existed, M&T did not breach it because M&T merely "transported milk from one location to another," and Agri-Mark has not met its heavy burden of establishing that M&T agreed to warrant the condition of the milk that it transported (*id.* at 9-10); (4) Agri-Mark's cross-motion seeking judgment against M&T on the basis of contractual indemnification is premature because there has been no determination of liability with respect to Great Lakes and Agri-Mark (*id.* at 11); (5) the mere fact that M&T obtained a certificate of insurance naming Agri-Mark as an additional insured does not evince that M&T agreed to protect and indemnify Agri-Mark for any breach of contract or negligence attributable to M&T (*id.* at 11-12); (6) Agri-Mark has not demonstrated its entitlement to "implied in fact indemnity," and neither the nature of the dairy industry nor the parties' relationship supports the conclusion that Agri-Mark owes such indemnity to M&T (*id.* at 12-13); (7) Agri-Mark's request for judgment over and against M&T on the basis of common law indemnification is premature because there has been no determination of liability with respect to Great Lakes and Agri-Mark (*id.* at 13); (8) M&T did it owe any duty to Great Lakes with respect to the delivery of the milk at issue (*id.*); (9) Great Lakes' alleged "myriad consequential damages" have not yet been assessed, were not reasonably foreseeable to M&T, and, according to M&T's damages expert, Great Lakes' response to the contamination "impacted and inflated" the damages Great Lakes realized (*id.* at 14-15); (10) the unavailability of a contract remedy is not an exception to the economic loss rule (*id.* at 16-17); and (11) the fact that federal and state regulations govern the hauling of milk does not preclude the application of the economic loss rule (*id.* at 17-18).

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact,

the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e).

Under the above-stated burden-shifting standard, where the non-movant wilfully fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court has no duty to perform an independent review of the record to find proof of a factual dispute. However, in finding the facts asserted by movant to be true, the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Legal Standards Governing Agri-Mark's Third-Party Claims**

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the general legal standards governing Agri-Mark's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which is intended primarily for review by the parties. (*See generally* Dkt. No. 61, Attach. 4 [Third-Party Def.'s Memo. of Law]; Dkt. No. 67, Attach. 12 [Third-Party Plf.'s Opp'n Memo. of Law]; Dkt. No. 69, Attach. 2 [Third-Party Def.'s Reply Memo. of Law].) Rather, the Court will merely reference portions of those standards where necessary below in Part III of this Decision and Order.

## III.    ANALYSIS

### A.    Whether M&T's Motion for Summary Judgment or Agri-Mark's Cross-Motion for Summary Judgment Should Be Granted with Respect to Agri-Mark's Third-Party Breach-of-Contract Claim

As set forth above, with respect to Agri-Mark's third-party breach-of-contract claim, M&T argues that a contract did not exist between the parties. (Dkt. No. 61, Attach. 4, at 4-5 [Third-Party Def.'s Memo. of Law].) Rather, M&T characterizes its business relationship with Agri-Mark as governed by an "oral agreement" that was not a contract. (*Id.* at 5.) Moreover, M&T argues that, even if a contract existed between the parties, M&T did not breach the contract. In opposition (and in support of its cross-motion), Agri-Mark argues that an oral contract existed, that M&T breached the contract, and that, as a result, Agri-Mark is entitled to summary judgment.

After carefully considering the matter, the Court concludes that, while it is undisputed that the parties entered into an oral agreement, genuine disputes of material fact exist with respect to certain terms of that oral contract (including the extent to which M&T purported to warrant its services).

"Under New York law, a binding contract can be formed without the execution of a written agreement." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 171 (2d Cir. 2014) (citing *Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148-49 [1979]); *accord, Seneca Insurance Co., Inc. v. Air Prof'l Assocs., LLC*, 14-CV-7330, 2016 WL 3087062, at *4 (S.D.N.Y. May 31, 2016) ("Oral agreements are valid and enforceable under New York law.") (citing *A. Montilli Plumbing & Heating Corp. v. Valentino*, 90 A.D.3d 961, 962 [N.Y. App. Div. 1st Dep't 2011]); *see also IBS Ketel, Ltd. v. Korea Telecom Am., Inc.*, 98-CV-4856,

2000 WL 821013, at *3 (S.D.N.Y. June 22, 2000) ("An oral agreement is 'binding except where the parties have explicitly made reference to an intention to be bound only by an executed written document.'") (quoting *DiMario v. Coppola*, 10 F. Supp. 2d 213, 220 [E.D.N.Y. 1998]). "The elements for establishing a breach of an oral contract are the same as those required for a written contract, but the plaintiff 'has a particularly heavy burden to establish objective signs of the parties' intent to be bound.'" *Volunteers of Am. of Western New York, Inc. v. Rochester Gas & Elec. Corp.*, 99-CV-6238, 2014 WL 3510495, at *11 (W.D.N.Y. July 14, 2014) (quoting *N.F.L. Ins. Ltd. by Lines v. B & B Holdings, Inc.*, 874 F. Supp. 606, 613 [S.D.N.Y. 1995]).[6] The Second Circuit has "articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). Specifically, courts must consider "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston*, 777 F.2d at 80. "These circumstances may be

---

[6] "In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 [2d Cir. 2004]). To determine the presence of mutual assent, the court must look for a "'manifestation or expression of assent . . . by word, act, or conduct which evinces the intention of the parties to contract.'" *Register.com, Inc.*, 356 F.3d at 427 (citation and emphasis omitted).

shown by 'oral testimony or by correspondence or other preliminary or partially complete writings." *Id.* at 81 (citation omitted).

The Court weighs these factors while remaining mindful of the "well-settled principle of New York law that '[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract,' [and] 'courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.'" *Hudson & Broad, Inc. v. J. C. Penney Corp., Inc.*, 553 F. App'x 37, 39 (2d Cir. 2014) (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 [1989]).  Notably, however, "New York courts have acknowledged that 'the concept of definiteness cannot be reduced to a precise, universal measurement'" because "at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract." *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, 08-CV-10578, 2010 WL 1257326, at *4 (S.D.N.Y. Mar. 12, 2010) (quoting *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 482-83).

With regard to the first *Winston* factor (i.e., whether there has been an express reservation of the right not to be bound in the absence of a writing), the record contains no evidence that either party expressed a reservation not be contractually bound in the absence of a written contract.  If anything, the parties' longstanding relationship with respect to dairy hauling suggests the opposite.  Accordingly, the Court finds that this factor weighs in favor of concluding that an enforceable oral contract existed between the parties.

As to the second *Winston* factor (i.e, whether there has been partial performance), as discussed above, the parties do not dispute that M&T hauled the milk at issue to Great Lakes'

plant on behalf of Agri-Mark, nor do they dispute that Agri-Mark paid M&T for hauling the load of milk at issue to Great Lakes' plant. As a result, this factor weighs in favor of concluding that an enforceable oral contract existed between the parties.

Turning to the third *Winston* factor (i.e., whether all of the terms of the alleged contract have been agreed upon), this factor presents a more difficult question. Gilchrist (Agri-Mark's transportation manager and fluid milk marketing manager) testified that Agri-Mark had oral agreements with the haulers it used to transport milk. (Dkt. No. 67, Attach. 24, at 50.) According to Thomas, M&T has had an agreement to haul milk for Agri-mark since 1993. (Dkt. No. 67, Attach. 25, at 78 [B.L. Thomas EBT].) On a weekly basis, Agri-Mark sends Thomas a schedule reflecting where milk deliveries are to be made. (*Id.* at 78.)

Haulers are paid an amount per hundredweight, at a rate "based on time and miles." (*Id.* at 51.) The parties agreed that M&T would be paid for its services at a rate set forth by a hauling committee based on load sheets.[7] (Dkt. No. 67, Attach. 11, at ¶ 28 [Third-Party Plf.'s Rule 7.1 Statement]; *accord*, Dkt. No. 67, Attach. 25, at 14 [B.L. Thomas EBT, explaining that he and Gilchrist "never discuss" price for hauling because Agri-Mark "ha[s] a hauling committee . . . . that dictates all that"].) Thus, the record reflects that the parties determined a price term by regular reference to a specific source during the course of their dealings, without need for regular negotiation of that term.

---

[7] According to Gilchrist, a load sheet "indicates which producers are on [a given] load, the item of pickup, the pounds, temperature, where it was delivered, and any other load sheets tickets [*sic*] that may have ridden on a load[.]" (Dkt. No. 67, Attach. 24, at 13; *see also* Dkt. No. 67, Attach. 90, at 7-8 [Agri-Mark Load Sheets regarding delivery at issue].)

Moreover, Gilchrist testified that Agri-Mark requires "all of [its] haulers to have insurance" to protect Agri-Mark from potential liability issues. (Dkt. No. 67, Attach. 24, at 52-53.) M&T was aware of this requirement "right from day one" of its relationship with Agri-Mark, which began in 1993.[8] (Dkt. No. 67, Attach. 25, at 15, 78 [B.L. Thomas EBT].) During oral discussions with Gilchrist and another Agri-Mark representative, Gilchrist requested that M&T name Agri-Mark as an additional insured on its insurance policies, and Thomas agreed to do so. (*Id.*) Moreover, M&T actually obtained an automobile liability insurance policy, effective from January 20, 2013 through January 20, 2014, and Agri-Mark was the certificate holder.[9] (Dkt. No. 67, Attach. 91, at 8 [Certificate of Liability Insurance].) Thomas also testified that the PMO required bulk milk haulers such as M&T to "[k]eep [a] clean and sanitized truck."[10] (Dkt. No. 67, Attach. 25, at 24 [B.L. Thomas EBT].)

Based on this evidence, and despite the lack of a written contract, the essential terms of the arrangement between the parties as reflected in their prior dealings (i.e., the rate of payment, the time and location of performance, the manner of preforming, and expectations concerning insurance coverage) were clearly understood and agreed upon. The fact that the parties'

---

[8]       During his deposition, counsel for Great Lakes asked Thomas, "You have an agreement with Agri-Mark to haul milk for them, correct," and Thomas responded, "Correct." (Dkt. No. 67, Attach. 25, at 78.) Counsel asked Thomas, "You've had that agreement since 1993," and he responded, "Correct." (*Id.*)

[9]       *See, e.g., Carlsen v. Rockefeller Ctr. N., Inc.*, 74 A.D.3d 608, 609-610 (N.Y. App. Div. 1st Dep't 2010) (concluding that "a valid and binding oral contract" existed, where parties had a "long business relationship," during which they "agreed that" one party would procure insurance coverage for the benefit of the other before any work was performed under the contract).

[10]      Gilchrist also testified that, with respect to the contract between Great Lakes and Agri-Mark, there was "an understanding" that milk would be delivered to Great Lakes in accordance with "regulatory requirements." (Dkt. No. 67, Attach. 24, at 56.)

agreement is less clear with respect to other aspects of their arrangement, including the extent to which M&T purported to warrant its services, does not mean that there was no oral agreement. On balance, the Court finds that the third *Winston* factor weighs in favor of concluding that an enforceable oral contract existed between the parties.

Finally, with respect to the fourth *Winston* factor (i.e., whether the agreement at issue is the type of contract that is usually committed to writing), the record reflects that (1) Agri-Mark never had a written contract with M&T during their twenty-plus year business relationship, and (2) Agri-Mark did not have written contracts with any of its other haulers.[11] (Dkt. No. 67, Attach. 24, at 50 [Gilchrist EBT].) While the existence of a regulatory framework governing the safe and proper handling, storing, and transporting of milk suggests a degree of complexity in undertaking these tasks, the expectations of the parties in contracting for these services in the course of their longstanding business relationship appear to be relatively straightforward.[12] Based on the record (limited, as it is, to the practices and course of dealing of the parties in this case), the Court finds that this factor weighs slightly in favor of concluding that an enforceable oral contract existed between the parties.

---

[11] Moreover, Gilchrist testified that "[m]ost of" Agri-Mark's annual purchase agreements with entered into with manufacturers (i.e., entities in the position of Great Lakes in this case) were also not reduced to written contracts. (Dkt. No. 67, Attach. 24, at 54.)

[12] In his affidavit, Gilchrist asserted that Agri-Mark "has standing at will reoccurring oral contracts with" its dairy haulers "to haul milk on an individual load basis." (Dkt. No. 67, Attach. 2, at ¶ 5 [Gilchrist Aff.].) As a result, Gilchrist asserted that "[e]ach load of milk hauled is a separate agreement wherein the hauler completes a regulatory required [*sic*] load sheet and then is compensated for that specific load." (*Id.*) The Court finds this characterization of the relationship between Agri-Mark and M&T consistent with other evidence in the record, including Thomas's testimony that he was advised of the work to be performed for Agri-Mark (i.e., where milk deliveries are to be made) on a weekly basis. (Dkt. No. 67, Attach. 25, at 78 [B.L. Thomas EBT].)

In sum, three of the four *Winston* factors weigh in favor of concluding that the parties intended to be bound by an oral agreement.

For each of these reasons, and (again) based upon the words and conduct of the parties as reflected in the record, the Court concludes that, while it is undisputed that the parties entered into an oral agreement with respect to hauling the allegedly contaminated milk at issue, genuine disputes of material fact exist concerning certain terms of that contract (including the extent to which M&T purported to warrant its services).

Accordingly, M&T's motion for summary judgment with respect to Agri-Mark's breach-of-contract claim is denied, and Agri-Mark's cross-motion for summary judgment with respect to this claim is also denied.[13]

### B. Whether Agri-Mark's Third-Party Negligence Claim Should be Dismissed as Barred by the Economic Loss Rule

After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Agri-Mark's opposition memorandum of law. (Dkt. No. 67, Attach. 12, at 21-24 [Third-Party Plf.'s Opp'n Memo. of Law].) To those reasons, the Court adds two points, which are intended to supplement (and not to supplant) those reasons.

First, under New York State law, parties may recover in tort for damage to property other than the property that is the subject of a negligence or tort claim. (Dkt. No. 67, Attach. 12, at 22-23.) *See also, e.g., Those Certain Interested Underwriters, at Lloyd's, London, subscribing to Policy No. Z101663/003 v. Farley Grp.*, 12-CV-0707, 2015 WL 5602924, at *32 (N.D.N.Y.

---

[13] For the same reasons, Agri-Mark's cross-motion for a judgment declaring that it is entitled to contractual indemnification from M&T in the event that Great Lakes succeeds against Agri-Mark on its claims in the main action (which have not yet been determined) is also denied at this time.

Sept. 23, 2015) (Suddaby, C.J.) (concluding that the economic loss rule did not bar recovery for damage to turf field that resulted from the collapse of an allegedly defective dome); *126 Newton St., LLC v. Allbrand Commercial Windows & Doors, Inc.*, 121 A.D.3d 651, 653 (N.Y. App. Div. 2d Dep't 2014) ("[T]he plaintiff also claims that the intrusion of water caused by the defective windows and doors resulted in injury to other structural elements of the building, such as flooring and walls. These losses constitute damage to 'other property' that was not the subject of the parties' agreement and, accordingly, support a valid tort cause of action.") (citations omitted); *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp.2d 241, 272 (S.D.N.Y. 2001) (concluding that the economic loss rule did not bar plaintiff's tort claims because "the TR-140 filters [at issue] caused harm to 'other property' in that they contaminated the water throughout the whirlpool spa system . . . ."); *Arkwright Mut. Ins. Co. v. Bojoirve, Inc.*, 93-CV-3068, 1996 WL 361535, at \*3 (S.D.N.Y. June 27, 1996) (concluding, on a motion to dismiss, that the economic loss doctrine did not bar negligence claim where "the amended third party complaint alleges that the defective governor damaged not only the generator in which it was housed, but also adjacent generators, floors, ceilings, furniture, and other items of real and personal property on the floor in which the generators were situated") (internal quotation marks omitted); *Vill. of Groton v. Tokheim Corp.*, 202 A.D.2d 728, 728-29 (N.Y. App. Div. 3d Dep't 1994), *lv. denied*, 84 N.Y.2d 801 (N.Y. 1994) (concluding that, in action concerning defective fuel dispensing system, economic loss rule did not bar recovery for "the costs of investigating and remedying the physical injury to its property caused by the contamination of soils and ground water from the leaking fuel").

Here, Great Lakes seeks to recover not only the purchase price for the allegedly contaminated milk delivered by M&T on behalf of Agri-Mark, but also for "losses from the

contamination of cheese and other milk at the Adams Plant[,] lost profits[,] time and expense incurred in ceasing production, and inspecting and cleaning Great Lakes['] . . . facilities and equipment[,]" and "other incidental and consequential damages." (Dkt. No. 1 at ¶ 27 [Plf.'s Compl.].) Based upon the foregoing, the Court concludes that the economic loss rule does not bar Agri-Mark's negligence claim to the extent that it seeks to recover from M&T the extent of the damages that Great Lakes may ultimately recover for the contamination of other products at its plant.[14]

Second, New York courts also recognize an exception to the economic loss rule "where the defendant has a duty independent of" its contractual obligations. *Rochester-Genesee Regional Trans. Auth. v. Cummins*, 09-CV-6370, 2010 WL 2998768, at *8 (W.D.N.Y. July 28, 2010); *accord, Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although

---

[14] In its memorandum of law in opposition to Agri-Mark's cross-motion, M&T does not oppose Agri-Mark's argument with respect to this exception to the economic loss rule. (*See* Dkt. No. 69, Attach. 2, at 15-18 [Third-Party Def.'s Reply Memo. of Law].) In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Here, the Court finds that, at the very least, Agri-Mark has met its modest burden. In the alternative, the Court finds, for the reasons set forth above, that Agri-Mark has met the more-rigorous burden appropriate for a contested motion.

it may be connected with and dependent upon the contract.") (internal citations omitted). Courts have held that the source of such an independent duty may include statutes or regulations. *See, e.g., RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 445 (S.D.N.Y. 2009) (concluding that the New York City Administrative Code "creates an independent legal duty to perform construction work in accordance with Code specifications"); *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Serv. Ctr.*, 02-CV-0504, 2005 WL 550940, at *3-4 (S.D.N.Y. Mar. 9, 2005), *amended*, 2006 WL 59770, at *1 (S.D.N.Y. Jan. 3, 2006) (finding New York State Uniform Fire Prevention and Building Code and OSHA regulations created duties independent of lease to store gasoline properly and granting plaintiff's motion for summary judgment with respect to its negligence claim).

In this case, the parties do not dispute that state regulations and the PMO govern the proper handling of raw milk, including with regard to the prevention of contamination. (Dkt. No. 67, Attach. 11, at ¶ 28 [Third-Party Plf.'s Rule 7.1 Statement].) *See also* 1 N.Y.C.R.R. § 2.27. Thomas testified that he was familiar with state regulations governing the cleanliness of milk-hauling vehicles.[15] (Dkt. No. 67, Attach. 25, at 55 [B.L. Thomas EBT].) As a licensed milk hauler (that is, an entity credentialed to perform tasks in a highly regulated industry), M&T had a duty independent of that arising from the putative oral contract with Agri-Mark to handle and transport milk in a safe, sanitary manner to prevent it from being contaminated; Agri-Mark has marshaled evidence that it relied on that knowledge in hiring M&T to deliver milk to Agri-

---

[15] Thomas's son, Bernard E. Thomas (the driver of Trailer 8042 on the date at issue), also testified that he was "[g]enerally" familiar with the regulations regarding the hauling of milk, and was aware that those regulations governed the sanitization of trailers used for hauling. (Dkt. No. 67, Attach. 29, at 14-15 [B.E. Thomas EBT].)

Mark's purchasers such as Great Lakes. Moreover, the failure to properly handle and transport milk resulted in its alleged contamination as well as the contamination of other milk in this case. Such a failure to properly handle the milk could foreseeably result in injury to countless ultimate consumers of the milk and products containing it. *See Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 552 (1992) (noting that defendant's "duty to act with reasonable care is not only a function of its private contract . . . but also stems from the nature of its services"). Moreover, the manner in which the alleged injury arose and resulting harm were "both typical of tort claims," in that property was damaged by an accidental metal contamination in a somewhat abrupt manner. *Sommer*, 79 N.Y.2d at 553. Thus, while New York courts have noted that "the public's interest in compliance with a statutory and regulatory scheme" is not, by itself, sufficient to give rise to tort liability, the harm alleged in this case is not "solely financial" and implicates consumer safety with respect to widely available products. *Cf. Verizon N.Y., Inc. v. Optical Communications Grp., Inc.*, 91 A.D.3d 176, 182 (N.Y. App. Div. 1st Dep't 2011) (affirming dismissal of tort claim premised on Verizon's misrepresentations about the availability of certain conduit space in its underground telecommunications network that was the subject of a lease because, although the conduct alleged violated the New York Public Service Law, the harm was solely financial and "the regulation of telecommunications carriers is 'not in the same league as the protection of the personal safety of citizens'") (quoting *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 317 [1995]).

Accordingly, based upon M&T's status as a licensed milk hauler and the nature of the damage allegedly suffered, the Court concludes that the economic loss rule does not bar Agri-Mark's negligence claim.

**C.     Whether Agri-Mark Cross-Motion for Conditional Indemnification Should Be Granted**

After carefully considering this matter, the Court answers this question in the negative for the reasons set forth in M&T's opposition memorandum of law.  (Dkt. No. 69, Attach. 2, at 13-15.)  Because neither liability nor damages have been determined with respect to the main action, the Court concludes that Agri-Mark's cross-motion is premature and more appropriately resolved in conjunction with the other issues that remain pending in this matter.[16]

**ACCORDINGLY**, it is

**ORDERED** that Third-Party Defendant's motion for summary judgment (Dkt. No. 61) is **<u>DENIED</u>**; and it is further

**ORDERED** that Third-Party-Plaintiff's cross-motion for summary judgment (Dkt. No. 67) is **<u>DENIED</u>**; and it is further

**ORDERED** that counsel are directed to appear on **NOVEMBER 9, 2016** at 2:00 p.m. in Syracuse, NY for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants/third-party defendants no later than  **OCTOBER 21, 2016**, and the parties are directed to engage in meaningful settlement negotiations prior to the conference.  In the event that counsel feel

---

[16]     Moreover, Thomas testified that he drove Trailer 8042 to Queensboro for a sanitary wash on the evening of August 12, 2013, after it was repaired and shortly before it was used to haul the allegedly contaminated milk at issue.  (Dkt. No. 67, Attach. 25, at 37-44, 73.) Although M&T's argument that is free from liability appears tenuous, particularly in light of the evidence marshaled by Agri-Mark, the Court concludes that Thomas's testimony raises something more than a "metaphysical doubt" with respect to the material facts.  *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 585-86.

settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: September 30, 2016
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge